## COUNTY OF PROVIDENCE, SEPTEMBER TERM, 1855, AT PROVIDENCE.

PRESENT:

Hon. WILLIAM R. STAPLES, Chief Justice.
Hon. GEORGE A. BRAYTON, } Justices.
Hon. ALFRED BOSWORTH, }

---

## ROBERT H. IVES v. GEORGE A. ARMSTRONG.*

Where a contract for the sale of land, by the acre, to be measured, provided, that the deed should be given on the 1st of September, and sooner if the purchaser required it, and that when delivered, one half the purchase-money, before stipulated to be paid in the fall, should be paid: *Held*, on a bill for specific performance by the purchaser, who claimed the purchase by assignment from an agent, that by going away on a visit to Saratoga on the 1st of September, without leaving any word with the seller, between whom and himself there had been no personal communication as to the purchase, and by not returning and offering to receive the deed and pay half the purchase-money until the 14th of September, the purchaser had been guilty of such neglect as to bar his

---

* The following case, the opinion in which was not read at the decision, was omitted from the 4th volume of Rhode Island Reports under a mistake of the Reporter that no opinion had ever been written and adopted by the court. Having since ascertained that what he supposed to be a minute by the chief justice of the grounds of his judgment was, in fact, adopted by the court, a report of the case is now, though out of place, given in full.

right to the interposition of the court; the precise time named in a contract of sale for performance by the purchaser, being as material in equity as at law, unless performance at that time be prevented by accident or mistake.

A servant of the purchaser testified, in the above case, that on the 1st day of September the seller came to the purchaser's house, in Newport, and asked to know where he was, and to whom he should execute the deed; and upon being informed that he was in Providence, said, "it would do when he came back," when he was told to ring at the door, where he would get more information. A sister-in-law of the purchaser testified, that upon the seller's putting to her, when he inquired at the door, similar questions, she replied, that the purchaser was in Providence, and was going to Saratoga, to be absent for a week or ten days, and offered to send him word, which the purchaser declined, saying, "It was of no consequence; any other time would answer;" or words of that meaning. The seller denied, in his answer, that he used these words, but admitted that the sister-in-law of the purchaser asked him, upon his inquiry as above, at the door, if the purchaser's wife, who was not up, should be spoken to, and that he replied, "No; I do not wish to disturb her;" and that he said, as he left the door, "I can see him when he gets back." *Held*, that this was no waiver of the time of performance in the contract, because, not having been communicated to the purchaser so that he could have acted upon it, it did not estop the seller from objecting to the neglect to perform on the day named in the contract; the seller denying in his answer, that by the language used by him, he intended to waive the time of performance, and stating, in substance, that he recollected precisely what he did say, because he designed at the time to take advantage of the purchaser's non-performance on that day.

The memorandum, signed by the defendant in the above case, contained no other description of the land contracted to be sold, than, "a certain lot of land containing about eleven acres, to be measured, for nine hundred dollars per acre, I to have the present crop;" *quære,* whether sufficient within the Statute of Frauds, though aided by clear proof, by parol, of the subject to which the treaty related?

BILL IN EQUITY, filed in the county of Newport, September 23, 1852, for the specific performance of a contract for the sale of a lot of land in Newport, containing about eleven acres, and lying north of, and adjoining to land of the complainant.

The bill, in substance, alleged, that the complainant employed one Charles T. Hazard to purchase the lot of the defendant for him, and that on or about the 28th day of May, 1852, an agreement of sale was made between said Hazard and the defendant for the lot, at the rate of $900 per acre,—the same to be measured;—Hazard taking the memorandum in writing of the contract in his own name; that the contract stipulated that the deed of the land was to be delivered by the defendant to Hazard at any time between the date of the memorandum and the first day of September, then next ensuing,—one half the purchase-money to be paid when the deed was delivered, and the balance on the 25th day of March then next,—and that possession of the land was to be given as soon as the defendant should take the spring crop off said land; that soon after, and on or about

Ives *v.* Armstrong.

the 10th day of June, 1852, said contract, having been originally made at the request, and for the benefit of the complainant, was assigned by said Hazard to him, of which the defendant subsequently had notice, and professed himself well satisfied and contented that the complainant should be the purchaser of said lot ; that on the 1st day of September 1852, when the deed was to be executed and the first half of the purchase-money was to be paid, the complainant being absent from Newport, where he then temporarily resided, and in Providence, and being about to proceed on a journey for the health of one of his family, the defendant called at the complainant's house in Newport, and requested to see the complainant, in order to learn from him, as he avowed, to whom he should execute the deed of said land, whether to the complainant alone, or to him jointly with his brother, and, upon being informed of the absence of the complainant, and that he had left Newport for Providence that morning, and would be absent probably for a week or ten days, and that, if the defendant desired, the family would immediately communicate with the complainant, replied, " Oh, no ; it is of no consequence, the business can be done just as well when he returns," or words to that effect ; whereby, as was understood and believed then, and as in effect it was, the defendant waived and deferred the fulfilment of the contract on the part of the defendant, until his said expected return ; that after the return of the complainant from his said journey, or within two days thereafter, one of said days being Sunday, and on the first week day that the complainant remained in Newport, to wit, on the 14th day of September, 1852, the complainant addressed a letter to the defendant, stating, in substance, that he had been absent, and was now passing his first day in Newport since his return, that he was ready to attend to the business relative to the purchase of said lot of land as soon as was convenient to the defendant, and offering to pay the money, which, upon measurement, should be ascertained to be then due on the contract for the purchase of the same according to the tenor and effect of the memorandum of agreement as changed by the conduct and consent of the defendant, to which the defendant replied as follows :—

48 *

Ives *v.* Armstrong.

"NEWPORT, September 14, 1852.

"Dear Sir,—I have concluded to keep the land, as you did not comply with the terms of the contract.

Yours respectfully,

(Signed)        GEORGE  A.  ARMSTRONG.

To R. H. IVES."

That the complainant had always been ready, able, and willing to perform his part of said contract, and that had not the defendant declined the offered communication of the family of the complainant with him, and agreed to wait until his return from his journey, the complainant could and would have forthwith returned from Providence to Newport, have attended to the measurement of said land, and have paid the one half of the money, and have received a deed of the same on the said 1st day of September, 1852 ; and that the defendant is estopped and debarred by his conduct and declarations under the circumstances aforesaid, from objecting that the complainant did not complete said contract, on his part, on or before said 1st day of September, 1852; that in and by his said letter addressed to the defendant, the complainant has tendered payment of the purchase-money and performance of said contract on his part, so far as he was obliged by law to do, and that the said letter of the defendant, in reply thereto, dispensed with and rendered unnecessary any further action on his part thereto ; that the complainant hath been ready and willing at and ever since, and is now, to measure and ascertain the quantity of said land, and to pay per acre therefor at the rate in said contract mentioned, and now offers to bring the whole or any part of the purchase-money for the same into the registry of the court, as the court may order, and to pay the same, in such sum or sums, and at such time or times, with or without interest or damages for delay, as the court may order, and as to justice and good conscience may appertain.

The bill, after the usual interrogatories adapted to its statements, then prayed for a specific performance of the contract of sale, after payment of half the purchase-money, which, upon measurement, might be ascertained to be then due and payable,

and upon security for the balance to be paid on the 25th day of March then next ensuing, with proper deductions for incumbrances, and for general relief.

The answer of the defendant admitted, that on the 28th day of May, 1852, he and Charles T. Hazard signed the following paper :—

" This is to certify, that I have sold to Charles T. Hazard, this twenty-eighth day of May, 1852, a certain lot of land containing about eleven acres, to be measured, for nine hundred dollars per acre; I to have the present crop; one half of the purchase-money to be paid in fall of 1852, the balance to be paid on the 25th day of March, 1853; the deed to be given on the first day of September, and sooner if I should require it, that is, the said Charles T. Hazard; that is to say, one half of the purchase-money to be paid at the time of the delivery of the deed.          (Signed)          CHARLES T. HAZARD,

May 28, 1852.                    GEORGE A. ARMSTRONG."

The answer then goes on to aver, that the defendant supposes that this paper is the so-called contract referred to in the complainant's bill, and submits to the court that the same is not a contract for land, none being described therein, no place being given or stated where any land is located, and it not even being stated that the defendant owns any land anywhere, and that the defendant did not thereby contract to sell any parcel of land in particular, nor any parcel whatever; that when and before said paper was written and signed, the defendant negotiated and dealt with Charles T. Hazard, and with him only, and knew no other person in relation thereto, and that said paper does not contain any word or expression referring to heirs, executors, administrators, and assigns, and that the defendant had reasons, in the relationship existing between him and said Hazard, which influenced him, but which would not have influenced him, if he had been dealing with a stranger; that sometime about or after the 10th day of June, 1852, Charles T. Hazard informed the defendant that he had transferred the said pretended contract to the complainant, which was the first time that the defendant had heard of this pretended transfer of

Ives *v.* Armstrong.

said pretended contract to the complainant; that it was not stated to him whether said pretended transfer was in writing or not,—whether signed by any person or not,—nor, if by any one, by whom,—nor was it even stated to the defendant by any one, whether said pretended transfer was absolute or conditional, or what were its terms—nor was the defendant ever notified by the complainant or by any other person, whether or not the complainant accepted such pretended transfer, nor did he hear a word from the complainant in relation to the subject thereof until the 14th day of September, 1852, nor has such pretended transfer ever, at any time, been shown to the defendant,—and that the defendant does not believe, and from the preceding denies, that any such pretended transfer exists, or, if any such exists, that it is in writing, or that it was ever signed by the complainant, and the defendant absolutely denies that any written transfer of said pretended contract, signed by the complainant, was ever presented or delivered to, or accepted by, the defendant; that the complainant is not a party in fact or law to the pretended contract of May 28, 1852, and that the complainant is not in any way, in law or equity, obligated to the defendant thereby, and that the defendant could not, in a court of law or equity, have or maintain any action, or obtain any judgment or decree against the complainant thereon or in relation thereto; that the complainant has not any particle of right to have or maintain any suit at law or in equity on said pretended contract, against the defendant, for that, amongst other reasons, the defendant never negotiated or passed a word with said complainant in relation to said pretended contract, and before and at the time of its making did not know the complainant in the matter at all, but dealt exclusively with another person to whom the defendant is liable, if to anybody, and that the defendant did not know that the complainant had anything whatever to do with it; that the defendant never expressed himself well satisfied or contented with said pretended transfer, or that the complainant should so become the purchaser, nor was he expressly called on to express his assent or dissent, but was told as aforesaid, not that it was to be done, but was done; and he then meant and intended, and now means and intends,

to stand on his legal rights in relation thereto, and has never done any act, matter, or thing in relation to said pretended contract, with the intention of, or as voluntarily waiving, on his part, any of his legal rights, and that no inference can therefore be drawn thence by the court, that he intended to agree to waive anything whatever; that after said statement of said Hazard in relation to said pretended transfer, the defendant heard nothing further on the subject until the 31st day of August, 1852, when he went to the house of the complainant in Newport and saw his son, and upon inquiry of him for the complainant, was told "that he was in Providence, but would return that night;" that the defendant then asked the complainant's son "if the complainant would be at home the next morning?" and was told that the complainant "would then be at home," and then replied "that he wished to see the complainant on business;" that the defendant is informed and believes, and therefore avers, that the complainant did return to his house in Newport that evening, and did leave Newport the next morning, at five o'clock, in the steamboat for Providence; that on the next morning, to wit, on the 1st day of September, 1852, at about 8 o'clock in the morning, the defendant again went to the house of the complainant, in Newport, and inquired "if he was at home," and was told by a lady (Miss Amory) who came to the door, "that the complainant was not at home—that he had left home that morning in the early boat for Saratoga;" that the defendant then inquired "when he would return," and was answered by the same person, "in about a week or ten days;" that the defendant then told her that he had "come to see to whom he should make a deed, to him, the complainant, or to him and his brother? as he was told they were together," and that the lady replied, "that Mrs. Ives was up stairs, but was not up, and that she would speak to her, if the defendant desired it;" that the defendant said, "no, he did not wish to disturb her," or words to that import, and then said as he left the door, "I can see him when he gets back," and left; that the preceding was the conversation which then and there took place, in the words then used, as the defendant believes and recollects; that the defendant, having called at the

complainant's house on the 31st day of August for him, and, not finding him, having left word that he wanted to see him the next day on business, and having called the next day and found that he had been at home and had left that morning to be absent for some time, and finding no one there to attend to the business, went immediately from the house of the complainant to tell the said Charles. T. Hazard, the person with whom the defendant had made the said pretended contract, and on his way there met one Daniel T. Swinburne, who went with the defendant to said Hazard's, and found said Hazard in his field; that the defendant then told said Hazard that he had been to the complainant's house to see about said pretended contract, and had found the complainant absent, and that he had left no one there to attend to the business, and that he had come to see said Hazard about it, and asked said Hazard " what he was going to do about it ? " to which said Hazard answered, " that he should do nothing about it himself,—that Mr. Ives (the complainant) was the man;" that the defendant could not find any person to attend to said business on the said pretended contract, on the part of the complainant; that land had risen in value, very much, between May and September, 1852, and that said Daniel T. Swinburne, on the 1st day of September, 1852, just after the above conversation with said Hazard, proposed to the defendant to buy of him the lot of land described in the plaintiff's bill, and offered him one thousand dollars per acre for it, and urged the defendant then and there to sell the same to him, and that the defendant told him " that he could not make a bargain with him for it on that day, and not until the next day;" that at the time the defendant called at the complainant's house, he was not told by any person that the family would immediately communicate with the complainant, if the defendant desired it, or anything of the kind; and the defendant unequivocally denies that he replied in said conversation, or said to any one, " Oh, no,—it is of no consequence; the business can be done just as well when he (the complainant) returns," as stated in the bill, or that the defendant, at any time, in said conversation, used words of that import or to that effect, or anything of the kind, or that he had anything of

the kind in his mind or intention, and expressly and unequivocally denies that he intended to waive or defer the fulfilment of said pretended contract at all, or in any way or manner, as to time, or otherwise; but on the contrary, so far from intending to waive anything, in any manner, by word or act, that the defendant intended to do what he supposed he was obligated to do by the letter of said pretended contract, and nothing more; and did not intend to waive or surrender any right he had by the terms of said pretended contract, or to give to the complainant any other or new right, by extending time or otherwise, beyond, or except what he might by law have, by said original pretended contract, at the time of the making thereof; that this, the defendant recollects and is very certain about, because land had greatly risen in price between May 28th and September 1st, and he had had offers for his land on September 1st, and afterwards, and before the 14th day of September; and the defendant then knew that it was the complainant's duty to be there and attend to the business, and that if he was not there, or did not leave some one authorized to attend to it, the defendant would be clear of any supposed obligation, growing out of said pretended contract, which would be greatly to his advantage, as he then supposed; and he intended then to waive nothing that was incumbent upon the complainant to do by the terms of said pretended contract, and did not, by word or act, waive anything, nor give anything to the complainant, or otherwise change or alter the terms or obligations of said pretended contract from what they were as written, and were at the time of the making thereof; that from the time that the defendant was so as aforesaid informed by said Hazard that he had transferred said pretended contract, about June 10th, to the 14th day of September, the complainant never spoke a word to the defendant in relation to said pretended contract, or the subject thereof, and never, directly or indirectly, alluded to it in any way, although, within said times, the complainant passed and repassed the defendant's house often, and was at the defendant's house to see persons there, and often met the defendant in the street and bowed and spoke to him in passing; that he did not converse with the complainant in relation to said pre-

tended contract till about the 14th day of September, 1852, and supposed that the complainant had entirely abandoned the matter,—and did then write a note to the complainant, which he believes to be correctly stated in the bill, and the defendant did then at once say to the complainant, promptly and frankly, the truth, that he had not complied with the terms of said pretended contract, and that the defendant was not bound by any supposed obligation contained in it; that as to the said defendant's being estopped from objecting that the complainant did not perform his part of the contract on the 1st day of September, 1852, the complainant went off from home and neglected to attend to said pretended contract without ever having passed a word upon the subject thereof, directly or indirectly, in any manner, and so went off and neglected to attend to the same, before the defendant had any conversation with any one in relation thereto, on the 1st day of September, 1852, and could not and did not so go off and neglect to attend to the same on the faith of anything which the defendant had said or done in relation thereto, nor was the defendant induced so to leave and neglect the same by any word or act of the defendant in relation thereto, and that the complainant chose his own mode and time of attending to his said business, and the defendant attended to his as he thought best; that on the evening of the 14th day of September, 1852, the complainant called at the defendant's house, and stopped in the road, in his carriage, opposite the defendant's house, and sent his servant in for the defendant; that the defendant was abed, but got up, and went out where the complainant was, in his wagon or carriage in the road, and that the complainant then said to the defendant, that he had received the defendant's note, and asked the defendant about it, or what he intended to do about it,—to which the defendant replied, that the complainant had not complied with the terms of said pretended contract, and that the defendant supposed that he did not intend to take it, and that the defendant was at liberty to keep it, or was not bound by said pretended contract; that said complainant did not then pretend that any waiver had been made by the defendant as to time, or otherwise, much less that he had acted on it,—but, instead of alluding to any-

thing of the kind, he said, that he had known the defendant so long that he did not expect this of him, and asked the defendant if he thought it honorable,—appealing to the defendant's sense of honor, and not relying on any waiver by the defendant of any right of complaint; to which the defendant replied, that he thought it both right and honorable; that the matter was one of legal right, and that he knew no legal reason why he should give the complainant anything; that the complainant became very much excited, and talked rapidly, without the defendant's having an opportunity to say much; and after the complainant had asked the defendant as above and the defendant had replied as above, and other conversation on the part of the complainant, and after the defendant had refused to give to the complainant what did not belong to him by the terms of said pretended contract, to the defendant's loss and disadvantage, and had told him, in reply, that he thought it both right and honorable,—that then, and not till then, the complainant asked the defendant if he did not say to Miss Amory, on the 1st day of September, "that any other time would do as well,"—to which the defendant replied, at once, that he did not say any such thing, or anything of the kind; that the complainant said nothing further of that matter, but that he had got to go to the steamboat to meet a gentleman, and would stop and see the defendant on his return; that he then left, and the defendant waited for him to return, but he did not stop, and never after that said a word further on the subject to the defendant, although he passed the defendant's house, and the defendant met him: that the complainant was not ready and willing, as alleged in his bill, to do and perform all that was incumbent on him to do and perform by the terms of said pretended contract; that, on the contrary, the complainant omitted, neglected, and refused to comply with the same; that the defendant did own a certain parcel of land on the 28th day of May, 1852, but that said pretended written contract has in it, or by its terms, no more reference to said parcel of land than it has to a lot of land in the moon, or to a certain lot in the land of spirits, and has no reference whatever to the lot of land described in the bill of complaint; and that the defendant insists and claims

that nothing by him stated in his answer shall be taken, construed, or made use of, for the purpose of supplying any defects in said pretended contract, or to aid or benefit the complainant, in any respect, in relation thereto, nor to prejudice the defendant in relation to said pretended contract, nor to give it any other effect than it has, as originally written.

Appended to the answer, was the note, written by the complainant to the defendant on the 14th day of September, 1852, and which was as follows :—

"NEWPORT, September 14, 1852.

" Dear Sir,—I shall be ready to attend to the business relative to the purchase of the land next north of my house whenever it suits you. I was called away on the 1st September, and this is the first day (except Sunday) I have since passed there.

Yours truly,

(Signed)                     ROBERT H. IVES.

Mr. George A. Armstrong,
                    Present."

The complainant having filed to this answer the general replication, proofs were taken on both sides, and, by agreement, the cause was removed for trial and decision to the county of Providence, where it was heard at the March term of the supreme court, 1854. Before the cause was decided, the then chief justice, Hon. R. W. Greene, resigned, and Mr. Justice Haile died, whereupon, at the September term, 1855, it was again heard, fully, by the court, as newly constituted by the intermediate appointment of Hon. William R. Staples, as chief justice, and of Hon. Alfred Bosworth, as a justice of the court.

At the trial, the complainant, in support of the bill, produced and read the deposition of *Moses B. Ives,* who, in substance, swore, that he was in Newport with the complainant on the 1st day of November, 1850, (afterwards, upon reflection, corrected by him, as the 1st day of November, 1851,) and heard a conversation. between Charles T. Hazard and the complainant, in reference to the purchase of the Easton land and the Armstrong land ; that the complainant then authorized Hazard to purchase the Easton land, about forty-five acres, for $10,000,—the com-

plainant to pay the annuities, which amounted to about $560 per annum ; and if that purchase was made, then to buy eleven acres from Armstrong, at $700 per acre,—the purchase to be made for the complainant ; also the deposition of *Charles T. Hazard,* who swore to the signatures of the defendant and himself to the memorandum of the contract, before recited in the answer of the defendant, and to his own signature to the following writing on the back of that memorandum :—

" Newport, June 9, 1852. The within named purchase having been made for account of Robert H. Ives, of Providence, I hereby assign to him the contract.

(Signed) CHARLES T. HAZARD."

The deponent also identified as written by him to the complainant, on the day it bore date, a letter, containing the following, as its first paragraph :—

" NEWPORT, June 2, 1852.

" Mr. R. H. Ives.

" Dear Sir,—According to your request, I saw Mr. Albert Armstrong the night I returned from Providence, and·finally succeeded in buying his land, at the rate of $900 per acre, to be measured ; deed to be given any time between this and the first of September, one half the purchase-money to be paid when the deed is delivered, and the balance to be paid on the twenty-fifth of March next, to have possession of the land as soon as he takes the present crops off.

\*    \*    \*    \*    \*    \*    \*

Yours respectfully,

(Signed) CHARLES T. HAZARD."

This deponent also swore, that both in the letter and in the contract he referred to the eleven acre lot owned by Armstrong, bounded southerly on Mr. Ives's land, and easterly partly on Mr. Ives's land, and northerly and westerly on his own land ; that Armstrong and himself were on the lot when the contract was made ; and that the next day, or a day or two after, he informed Armstrong that the contract had been transferred to Mr. Ives. On cross-examination the defendant swore, that Mr. Ives wrote the assignment on the back of the contract, and that he

did not think that he read it before he signed it; that Mr. Ives sent for him to come up to the Bellevue House to see him, and that he went to see him, he thought, in the evening; that when he got there Mr. Ives made the remark that he understood that the witness had bought this lot of land, and as the witness thought, that he remarked he had so heard the next day after the purchase was made, in Providence; that they talked about the price, and the deponent told him what the price was; that the deponent thought that Mr. Ives made some remark about the price being a high price; that the deponent told him that he did not think that it was a high price, that it was worth the money to attach to his (the witness's) land; that Mr. Ives then asked him, what he was going to do with it, and that witness replied, let him have it, if he wanted it; that it was getting late, when, as deponent was about to leave, Mr. Ives asked him if he were coming, or would come, to town in the morning; and deponent replied, that he had no particular business, but would come if he requested it; that, as he thought, Mr. Ives then requested him to call at the Bellevue House the next day at 1 o'clock, which he did, and found him; that he does not recollect how the conversation commenced about the land, but that Mr. Ives asked him if there was any writing between the deponent and Mr. Armstrong in regard to the purchase; that the deponent replied, that there was no deed passed, but that there was a written agreement, and that witness had it; that Mr. Ives, as the deponent thought, said he would like to see it; that deponent told him that he hadn't it with him, but had left it at home; but supposing that he was in a hurry to go off, his carriage being at the door, and making the remark again, the witness told him he would go down and get it if he would wait for it; that he went down and got it and handed it to Mr. Ives; that, he thought, Mr. Ives remarked, that it was precisely as witness had stated to him, the witness having stated the day before what the agreement was; that Mr. Ives kept the agreement in his hand, and walked back into the office of the Bellevue House, and said he would write the transfer, and did so, and asked deponent to sign it; that Mr. Ives neither paid, nor agreed to pay, nor gave him in any form whatever, anything as the considera-

tion for the transfer, and that the witness did not, in making the contract, consider himself as acting, in any way, for said Ives. Upon being reëxamined, on both sides, the deponent said, that previously to the contract with Armstrong, he thought that Mr. Ives had spoken to him about the purchase of the land in Providence, but that he could not recollect precisely whether, in this conversation, he fixed any price for the land beyond which he would not go.

The complainant also produced and read the deposition of *Louise M. Amory,* that on the morning of the 1st September, 1852, hearing the defendant inquiring for Mr. Ives at the door of his house in Newport, she went to the door, and the defendant said that he had called to inquire if a deed of land was to be in Mr. Ives's or his brother's name ; that she told the defendant that Mr. Ives was in Providence, and was going to Saratoga, to be absent for a week or ten days, and that the defendant then said " it was of no consequence, any other time would answer." Upon cross-examination the deponent said, that she repeated the conversation to Mrs. Ives, who had not come down stairs, immediately, that she might inform Mr. Ives of it, and that she had heard nothing more of it till about a fortnight since ; that she, the deponent, told the defendant that she would let Mr. Ives know or would send him word, which, exactly, she was uncertain, nor could she swear that the defendant used the same expressions stated by her, but was quite sure that he used to her the meaning of what she had said : also, the deposition of *Donald McDonald,* that either in the latter part of May, or first of June, the defendant said to him, that he considered the land bought by Mr. Hazard was for Mr. Ives, and that if Mr. Ives had bought it himself, instead of employing Mr. Hazard, he would have had it cheaper ; that, on the 1st day of September, he could not tell the hour, but thought it was about the time the coachman was getting the carriage ready to go to the boat, the defendant came to him and asked where Mr. Ives was ? and that he told him that he was in Providence ; that defendant asked if deponent knew, whether the deed was to be made out for Mr. Ives or Mr. Moses Ives ? and that deponent told him he didn't know exactly ; that defendant then said " it would

49 *

do when he came back;" that deponent had no more conversation with him, but told him that he had better ring the bell at the door, where he would get more information. On cross-examination, the deponent said he knew it was the 1st of September when this conversation took place, because the defendant told him so; that about the same time, he believed the next day, he told Mr. Gammell of it, though Mr. Gammell did not stand to talk with him, so that he could tell him the whole; since which he had talked with no one about it except Mr. Payne (the examining counsel of the complainant) to-day.

The defendant produced at the trial, and read, the deposition of *George H. Wilson*, who deposed, that in the early part of September, 1852, somewhere near the 10th, he offered the defendant a thousand dollars an acre for the land in question, and that he thought he was acquainted with the value of land in that vicinity; and that he should suppose that there was a rapid rise of land there about the 1st day of September, as land had risen in Newport, in other parts of the place; also, the deposition of *Daniel T. Swinburne*, that on the 1st day of September, 1852, as he thought, and in the morning, he made the same offer to the defendant for the same land; and the reason that he thought it was the 1st of September was, that the defendant replied, "that he could not sell the land to him then, but would talk to him the next day; as he had agreed to sell it in writing to Mr. Hazard, and that Mr. Hazard had assigned his agreement to Mr. Ives; and that he had come to Mr. Ives's house for the purpose of making arrangements for delivering him the deeds, and they told, there, that Mr. Ives was in Saratoga; he did not know what arrangement he had left to take this land from him, as his agreement was up that day." This deponent also deposed that land rose very rapidly from about that time to the present.

The defendant also produced and read the deposition of *Charles T. Hazard*, who deposed, that on the 1st of September, 1852, he was going across the fields, near the defendant's land, and met the defendant and Swinburne at the gate that enters the defendant's lot; that he thought that Mr. Swinburne looked up and said, "Well, Mr. Ives is not here to attend to taking a

deed of his land to-day;" and then said to the deponent, "What are you going to do about it?" that deponent replied, "that he had nothing to do about it; that he supposed Mr. Ives would attend to that;" that Swinburne looked up and said, "I consider the bargain at an end," as the deponent's impression was; and that deponent thought that he, Swinburne, then said to defendant, "I will buy your lot or your land," he didn't recollect the exact words; that he thought that defendant in reply said, that "he did not feel himself at liberty to sell the land on that day," but, "after to-day I should feel myself at liberty to sell it;" that he was not positive that Swinburne named any price. This deponent also deposed, that he thought that there was a rapid rise in the value of land in the vicinity of Newport in and about the months of August and September, 1852; and that he had no authority to act for the complainant in relation to the taking of any deeds on the 1st of September. On cross-examination he further stated, that there was a suit pending between himself and the complainant in relation to the farm occupied by him in Newport.

*Payne*, with whom was *Ames*, for complainant:—

1st. It is evident that Hazard, though he swears that he did not consider himself the agent of Mr. Ives in making this purchase, was his agent; the evidence being far stronger than in *Bethune* v. *Farebrother*, 1 Dan. Ch. Prac. 246. As such agent he need not be a party to the bill; since, at law, it is the undoubted right of the principal to interpose and supersede the right of his agent, by claiming to have the contract performed to himself, though made in the name of his agent. Ibid. 245–248.

The statute of frauds is not, as contended, in the way of parol proof of the agency. It does indeed require, in such a case as this, the memorandum in writing to be signed by the party or by "some one, by him thereunto lawfully authorized," but does not require the authority to be in writing; and at the common law, an agent, to make a simple contract, may be constituted, and, therefore, proved to have been constituted, by parol. *Wilson* v. *Hart*, 7 Taunt. 295; *Duke of Norfolk* v. *Worthy*, 1 Campb. 337; 1 Sugd. on Vendors, p. 130, ch. 3, § 5, art. 2, n. 1, and cases

cited; *Huntingdon* v. *Knox*, 7 Cush. 374; *Salmon Falls Manu-facturing Co.* v. *Goddard*, 14 How. 454, 455. It is true, that where the memorandum in writing expressly declares the character in which the parties contract, it cannot, upon another principle, be contradicted by parol; and this distinction which is ignored on the other side, reconciles all the cases. If the memorandum be silent as to the character in which the parties contract, as in this case, parol proof of the real character, whether as principals or agents, in which they contracted, is perfectly consistent with it. *Shaw* v. *Nudd*, 8 Pick. 9; *Shaw* v. *Finney*, 15 Met. 453; *Huntingdon* v. *Knox*, 7 Cush. 374; *Finley* v. *Stewart*, 5 Sandf. Sup. Ct. R. 101; *Bickerton* v. *Burrell*, 5 M. & S. 383; *Higgins* v. *Senior*, 8 M. & W. 834; *Humble* v. *Hunter*, 64 Eng. C. L. Rep. 309.

The agent, by the form of his contract, and the principal, if discovered, as one who has contracted through another, are both bound to the other party, who can lose nothing, and may gain much by the rule; and though the latter, on the other hand, is in turn subjected to the principal, it is, in general, of no consequence, as in this case, to whom he performs, so that he is absolved by performance; and, if he can prove that it is, in the way of pecuniary damage, he is protected in a court of equity, and only when he can prove it. *Hall* v. *Warren*, 9 Ves. 605; *Fellows* v. *Lord Gwydyr*, 1 Sim. 63; S. C. on appeal, 1 Russ. & Mylne, 83; *Crosbie* v. *Tooke*, 1 Mylne & Keene, 431; 1 Sugd. on Vendors, pp. 242, 245, ch. 4, § 3, art. 57, 61.

2d. The plaintiff, if not the principal of Hazard, is, at least, his assignee; and the assignment being total, and leaving no interest in the assignor, and bringing upon him no new liability, the assignor need not be made a party to the bill. Story, Eq. Plead. 153; *Trecothick* v. *Austin et al.* 4 Mason, 44. This is the American doctrine; our courts of law taking notice of equitable assignments of legal choses, which the English courts of law do not; *Hobart* v. *Andrews*, 21 Pick. 532, Wilde, J.; and the case of an assignment of an equitable chose, in which the assignor need not be a party to the bill, illustrates the effect of this difference. 1 Dan. Ch. Prac. 254.

3d. The memorandum, though not as definite as could be de-

sired as to the subject of the contract, is so aided in this respect by the proof properly admissible for such a purpose, and by the answer itself, as to be sufficient under the statute of frauds. " Where property is described generally, (in the memorandum,) parol evidence has always been admitted to show to what house the treaty related." Sir William Grant, *Ogilvie* v. *Foljambe*, 3 Meriv. 53, cited, and so approved, 1 Sugd. on Vendors, p. 117, and note, ch. 3, § 3, art. 18, p. 127, n. 2 ; 1 Jarman on Wills, 359, 360, 367 ; Ibid. 318, 357, 376, 383 ; *Hunt* v. *Hart*, 3 Brown, Ch. Cas. 311 ; *Bleakley* v. *Smith*, 11 Sim. 150 ; *Richardson* v. *Watson*, 4 B. & Ad. 800 ; *Ryers* v. *Wheeler*, 22 Wend. 150 ; *Barry* v. *Comb*, 1 Pet. 652 ; *Nichols* v. *Johnson*, 10 Conn. 192 ; *Wiswall* v. *Mc Gown*, 2 Barb. Sup. Ct. R. 277 ; *Allen* v. *Lyons*, 2 Wash. C. C. R. 475 ; *Clark* v. *Burnham*, 2 Story, 1. These cases are to be distinguished from the cases cited on the other side ; such as *Henry* v. *Hancock*, 4 Dow. 145 ; *Gord* v. *Needs*, 2 M. & W. 129 ; *Miller* v. *Travers*, 8. Bingh. 244 ; *Boardman* v. *Reed*, 6 Pet. 328 ; *Sherman* v. *Kitzmuller*, 17 S. & R. 48 ; *Parkhurst* v. *Van Cortlandt*, 1 Johns. 273 ; *Wright* v. *Pond*, 10 Conn. 255, and the cases from 1 Jarman, 320, 321, where there was either a purposed indefiniteness, or the parol proof offered was not consistent with, but would contradict the writing. They are also to be distinguished from the cases of patent ambiguities, which cannot be aided, because not disclosed by parol, and which are cited against us.

These cases also show that the statute of frauds is not in the way of a memorandum being properly aided by parol proof, consistent with it, to ascertain the subject of the contract, and are to be distinguished from the numerous cases cited on the other side, where, either the memorandum was not signed by the party to be charged, or by his agent, or, it did not appear from it that there had been a contract of sale, or, if a sale, who were the parties to the contract, or, what were the conditions of it, or, if it were a grant, to whom, or for whose benefit, it was made.

4th. The memorandum is certain as to price, giving the rate per acre—the time of first payment, determined, by the time of the delivery of the deed, to be on or before September 1, 1852, and in this way giving the time of the delivery of the deed ; the

objections on this score being frivolous, and confounding the certainty required by the statute in such a memorandum, with what is not required, a *fixed* time at which anything stipulated is to be done.

5th. The objection, that as Mr. Ives did not sign the memorandum there is no mutuality of remedy, is answered by all the authorities,—that the filing of the bill gives all the mutuality of remedy that a court of equity requires; the very case of *Hepburn* v. *Arnold*, 5 Cranch, 262, cited for the respondent, showing, that the question of mutuality of remedy relates only to the time of the decree.

6th. The defence, that the complainant was not at home to measure the land and receive his deed precisely on the 1st day of September, and did not return to Newport until a fortnight after, and manifest his readiness to go on with the contract, is a singular one, in a court of equity, under the circumstances of this case.

It is a maxim in equity jurisprudence, that time, in the sense of exact time, is not, as at law, of the essence of a contract; and the whole relief against forfeitures and penalties, of all sorts, is based upon this maxim. It may, indeed, under circumstances, by way of acquiescence, or because unfairly designed, be of more importance than at law. In application to specific performance, we have the highest authority, that " equity, which from its peculiar jurisdiction is enabled to examine into the cause of delay in completing a purchase, and to ascertain how far the day named was deemed material by the parties, will, in certain cases, carry the agreement into execution, notwithstanding that the time appointed be elapsed, and although there has been no waiver." 1 Sugd. on Vendors, p. 287, ch. 5, § 1, art. 11. To affect the right, the delay must have been long, implying gross laches, or when no steps have been taken by the party applying, though urged by the other party, and time, in this way, made material. So, in case of sales of reversions, and of estates sold for trade or manufactures, or where the subject is in it nature fluctuating, or where the delay was purposed, and there has been a change of value. Ibid. pp. 288–292; 2 Story, Eq. Jurisp. §§ 771, 777, n. 1; 780, n. 1; 2 Hare & Wal. Lead.

Cas. in Equity, part 2, pp. 26–30, commenting on *Seton* v. *Slade*, 7 Ves. 265 ; *Roberts* v. *Berry*, 17 Eng. L. & Eq. 400–404. See also *Lloyd* v. *Collett*, 4 Bro. Ch. Cas. 469, remarks of Lord Rosslyn ; *Fordyce* v. *Ford*, Ib. 499 ; *Rogers* v. *Saunders*, 4 Shepl. 92. Not a case of any authority can be found where a court of equity, on account of the lapse of a fortnight, during a temporary absence of the vendee having no reference to the question of the contract,—an instant offer to perform on his return,—the time of performance being by the contract, " in the fall," " *on or before* the 1st September," and so indefinite,—the land " to be measured,"—that is, something to be done on both sides before the first payment, and no steps before the day taken on the other side,—and no injury from the delay to the vendor,—has refused to compel the vendor to perform his contract with the vendee. The rise in the value of the land began in August, before the day of performance,. according to the testimony of Hazard, one of the witnesses of the respondent, and on the 1st day of September, the defendant proves that he was offered $100 per acre advance on the contract price. Between the 1st and 14th of September the rise could not, as appears from the same amount per acre being offered at these several times by the other two witnesses of the respondent, have been of any importance ; nor can the court suppose that the complainant went away on the 1st of September to avoid doing that which he was desirous to do on the 14th.

7th. But giving to time all the importance in a court of equity which it has in a court of law, the conduct of the respondent at the house of Mr. Ives, when he called on the morning of the 1st of September, using, as he admits in his answer, language, under the circumstances, calculated to put the family off their guard as to his deeming performance of the contract on that day of any importance, is a complete waiver of his right to insist, by way of defence, to this short lapse of time. If, as he would make us believe by his answer, and by his conduct and declarations immediately after, as he has taken pains to prove them, he measured his words on that occasion, having in his mind the idea and hope to escape his contract by the inadvertence of Mr. Ives to attend to it on that pre-

cise day, a court of equity should give to them their fullest force, lest, under the idea of holding one party strictly to the letter of his contract, they should enable the other to evade its substance by lulling words, calculated or designed to deceive.

That what was said by the respondent on that day, however designed, had the effect to put the family of Mr. Ives off their guard, and prevented them from sending at once to him, or to his mercantile house in Providence, to attend to his part of the contract, is clear from the evidence of Miss Louise M. Amory; and both she and McDonald swear that he gave them to understand, after being told how long Mr. Ives would be absent, " that it would do when he came back," and " that it was of no consequence; *any other time would answer.*" If such conduct and declarations, under such circumstances, be not a waiver in equity of the precise time of performance in such a contract, it is difficult to imagine what would be.

The waiver of the time of performance in a contract does not require an agreement to defer performance, or a strict estoppel to insist upon the time named in the contract, but will be implied by a court of equity, from any acts or declarations of the parties which show that they did not deem the time material.

8th. The objection that the complainant did not, before commencing his bill, tender any money, is answered by the fact, that on the 14th day of September, the respondent absolutely refused to go on with the contract. By giving us notice, so peremptorily, that our tender would be ineffectual, the respondent made it unnecessary. *Crary* v. *Smith*, 2 Comst. Appeals, 60, 65; *Eames* v. *Savage, Adm.*, 14 Mass. 425; *Newcomb* v. *Brackett*, 16 Ib. 161; *Ashley et al.* v. *Finney*, 15 Pick. 548; 1 Sugd. on Vendors, p. 264, ch. 4, § 4, art. 67.

*W. H. Potter*, with whom was *H. Y. Cranston* and *A. C. Greene*, for respondent:—

1st. The contract itself, as set forth in the memorandum, is void for vagueness, uncertainty, and inconsistency.

It gives no name, description, boundary, or locality of the land contracted to be sold; does not name the state, and far

Ives *v.* Armstrong.

less the county in which it is situate, so as to give to this court, sitting in Newport, jurisdiction over this cause.

It fixes no price per acre, but only says nine hundred dollars for *an acre*, nor, with certainty, the time of first payment,— only, in the fall, when the deed is delivered, on or before the 1st September, without saying of what year. It does not say whether the land contracted for is part of other lands, or by itself, or that the defendant owned the land, or even had it in his possession.

It is not a case of ambiguous or inadequate description, or of false or superfluous description, but of no description at all; is void for insufficiency of description, and is incapable of being aided by parol at the common law. 1 Jarman on Wills, 316, 318; 1 Greenl. Ev. §§ 235, 287–301; *Rothmiller* v. *Myers*, 4 Dessau. R. 215; *Tripp* v. *Frazier*, 4 Har. & Johns. 446; *Sherman* v. *Kitzmuller*, 17 S. & R. 48; *Boardman et al.* v. *Lessee of Reed & Ford et al.* 6 Pet. 328, 345; *Miller* v. *Travers*, 8 Bingh. 244; 4 Com. Dig. tit. Grant, E. 14; Sheppard's Touchstone, 250; *Thomas* v. *Marshfield*, 10 Pick. 364, 367; *Hornbeck* v. *Westbrook*, 9 Johns. 73; *Jackson* v. *Rosevelt*, 13 Ib. 97; *United States* v. *Forbes*, 15 Pet. 184, 185, 233, 275; *Same* v. *Miranda*, 16 Ib. 159, 160; *Same* v. *King et al.* 3 How. 786, 787.

2d. The statute of frauds requires the whole agreement to be in writing, and does not permit the subject of the contract to be supplied by parol. 1 Greenl. Ev. §§ 262, 268, 302; 2 Story, Eq. Jurisp. §§ 764–770; *Haynes* v. *Graham*, 6 Ad. & Ell. 61–74; *Marshall* v. *Lynn*, 6 M. & W. 109; *Rich* v. *Jackson*, 4 Bro. Ch. Cas. 514; 1 Scho. & Lef. 22; *Smith* v. *Arnold*, 5 Mason, 414; *Ladd* v. *King*, 1 R. I. Rep. 225; *Baptist Church* v. *Bigelow*, 16 Wend. 28; *Bailey* v. *Ogden*, 3 Johns. 394; *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. R. 273; *Gaiglen* v. *Fry*, 5 Harris, 496; *Sherburne et al.* v. *Shaw*, 1 N. H. 157; *Morton* v. *Dean*, 15 Met. 385; *Grant* v. *Naylor*, 6 Cranch, 224; *Abeel* v. *Radcliffe*, 13 Johns. 297, 300; 3 Ib. 210; 2 Denio, 87; *Kendall* v. *Almy*, 2 Sumn. 278; *Carr* v. *Duval*, 14 Pet. 77; 3 Barb. Sup. Ct. R. 50; *Parish* v. *Koonz*, 1 Parsons, 79; *Osborn* v. *Phelps*, 19 Conn. 63; *Wright* v. *Pond*, 10 Ib. 255; *Elder* v. *Elder*, 1 Fairf. 80.

3d. The plaintiff must show a contract certain, clear and un-

ambiguous, to entitle him to a specific performance. *Kendall* v. *Almy*, 2 Sumn. 278; *Smith* v. *Burnham*, 3 Ib. 463; *Colson* v. *Thompson*, 2 Wheat. 336; *Walton et al.* v. *Coulson*, 1 McLean, 120; 3 Munf. 189; 5 Ib. 396; 7 J. J. Marsh. 123; *Emery* v. *Hale*, 5 Ves. 846; *Milnes* v. *Gery*, 14 Ib. 407.

4th. To a bill for specific performance, mutuality of remedy is essential, and there was none in this case; the complainant not having given notice even, to the respondent, that he would perform the contract on his part, until a fortnight after the day of performance had passed. See cases referred to on this point by counsel for respondent, in case of *Ives* v. *Hazard* (4 R. I. Rep. 23, 24).

5th. Courts of equity construe contracts in the same manner as courts of law; although, in equity, the parties may, by their agreement or conduct, extend the time of performance. Batten on Specif. Perf. 38; *Parkin* v. *Thorold*, 11 Eng. L. & Eq. R. 275, 278; *King* v. *Wilson*, 6 Beav. 124.

6th. Without such agreement, time is material in a court of chancery. *Pincke* v. *Curtis*, 4 Bro. Ch. Cas. 329; *Lloyd* v. *Collet*, Ib. 469; *Fordyce* v. *Ford*, Ib. 499; *Spurrier* v. *Harwood*, 4 Ves. 677; *Harrington* v. *Wheeler*, Ib. 686; *Marquis of Hertford* v. *Boore*, 5 Ib. 719, 720, n.; *Guest* v. *Homfray*, Ib. 818; *Alley* v. *Deschamps*, 13 Ib. 224; *Benedict* v. *Lynch*, 1 Johns. Ch. R. 370; *Dominick* v. *Michael*, 4 Sandf. Ch. R. 426; *Wells* v. *Smith*, 7 Paige, 22; *Rogers* v. *Saunders*, 4 Shepl. 92; 2 Brock. 100, 101; *Goodwin* v. *Lyon*, 4 Port. 297; *Rector* v. *Price*, 1 Mis. 373; *Hepburn* v. *Auld*, 5 Cranch, 262, 265.

7th. The time of performance under the contract was waived neither by agreement or estoppel; not by agreement, for the complainant and respondent never met at all in the matter, personally or by their agents,—Miss Amory being a mere visitor at the house of the complainant, and having no authority, in any way, to act for him, even to receive or communicate a message, much less to give an answer to one. A wife even, for some purposes relating to their dwelling-house, is not the agent of her husband. *Humes* v. *Taber et al.* 1 R. I. Rep. 464. It was not waived by estoppel; since Mr. Ives never acted upon what was said by the respondent, as he was away, and it was never communicated to him.

8th. The plaintiff, claiming to enforce a written contract, cannot prove, against the writing, that the contract was made by one of the parties as his agent. *Humble* v. *Hunter*, 12 Ad. & El. (N. S.) 310; *Higgins* v. *Senior*, 8 M. & W. 834; *Clowes* v. *Higginson*, 1 Ves. & Bea. 524.

9th. Nor can he as assignee maintain this suit, without joining his assignor, Hazard. Story, Eq. Pl. § 153 and notes.

10th. The complainant has not, as he should have done, tendered the purchase-money and brought the same into court. See cases referred to by counsel for respondent, in *Ives* v. *Hazard* (4 R. I. Rep. 24).

STAPLES, C. J. The prayer of this bill is for a decree for the specific performance of a contract for the sale of lands, in the city of Newport. The bill charges, that on the 28th day of May, 1852, the defendant was the owner of a lot of land situate in the city of Newport, next north of the complainant's house; that he employed one Charles T. Hazard, as his agent, to purchase the same; that said Hazard did purchase the same on said 28th of May, and took from the defendant the following written memorandum of the contract of sale:—

"This is to certify, that I have sold to Charles T. Hazard, this twenty-eighth day of May, 1852, a certain lot of land, containing about eleven acres, to be measured, for nine hundred dollars per acre; I to have the present crop; one half of the purchase-money to be paid in fall of 1852, the balance to be paid on the twenty-fifth day of March, 1853; the deed to be given on the first day of September, and sooner if I should require it, that is, the said Charles T. Hazard, that is to say, one half the purchase-money to be paid at the time of the delivery of the deed. (Signed) CHARLES T. HAZARD,

May 28, 1852. GEORGE A. ARMSTRONG;"

that said Hazard, afterward, on the 9th of June, executed the assignment of said contract to the complainant on the back of said memorandum, as follows:—

"Newport, 9th June, 1852. The within-named purchase having been made for account of Robert H. Ives of Providence, I hereby assign to him the contract.

(Signed) CHARLES T. HAZARD;"

which assignment was subsequently made known to the defendant, who was satisfied with the same; that the complainant was absent from Newport on the 1st day of September, and that subsequently, on the 14th of September, he gave the defendant notice that he was ready to complete the purchase, and that the defendant then declined to perform it. The bill further charged, that the defendant waived the performance of the contract on the 1st day of September, and that he is now, and always has been ready to perform his part of the same.

The answer of the defendant admits the execution of the memorandum to Charles T. Hazard on the day it bears date, and insists, that he dealt with Hazard, not as agent, but in his own name and right,—that Hazard told him, after the execution of the assignment on the back of said memorandum, that the same was made, but not that it was in writing; that the contract with Hazard was not assignable,—that the memorandum is indefinite, and does not refer to any specific piece of land, and not certainly to the land claimed and described in the complainant's bill. The answer avers, that on the 31st day of August, the defendant went to complainant's house, in Newport, and again on the morning of September 1st, and the complainant being absent at both times, he told the person he saw there, that he came to see to whom he should make his deed, whether to the complainant alone, or to the complainant and his brother, and was told that the complainant had gone to Saratoga,—that land in Newport had risen in value between the 28th of May and the 1st of September. The answer denies that the defendant ever waived the performance of the contract on the 1st day of September, and avers, that complainant never told or intimated to him that he was interested in the contract or memorandum made by the defendant with said Hazard, or exchanged a word with him on the subject. The answer admits that the defendant received notice from the complainant, by letter dated September 14th, that he was then ready to complete the said purchase, and that he, the defendant, then and now declines to do the same; the time limited in the memorandum having expired.

The complainant filed the general replication, and the cause

came on to be heard on the exhibits and proofs filed and taken in the cause.

At the trial, the defendant resisted the claim of the complainant on several grounds. Among others, that the proofs did not establish the agency of Hazard in making the supposed contract,—that the contract itself was void from the uncertainty of the description of the land referred to in it,—that there was not a mutuality of contract and remedy, so that the defendant could have compelled the complainant to a specific performance of the contract set up in the bill, and that the complainant had, by his gross negligence, discharged the defendant from the contract, if any were made.

We do not deem it necessary to go into a consideration of any, except the last point made by the defendant. Taking for granted that there is no ground of defence in any of them, which we do only in view of the substantial defence contained in the last, the complainant is not entitled to the decree prayed for in the bill.

The contract between the defendant and Hazard was executed on the 28th of May, and on the 9th day of June, following, was transferred to the complainant. From the last date up to the 14th of September, not a word passed between the complainant and defendant, nor was any step taken by the complainant in relation to it. By the terms of the contract, one half of the purchase-money was to be paid on the execution of the deed, and that was to be on any day prior to and including the 1st day of September, at the option of the complainant. The defendant was to retain possession and to remove his crops, whether the deed was claimed by the complainant on the 1st day of September or before. No laches can be imputed to the complainant until after the 1st day of September. As he could not have actual possession at that time, there was no reason why he should not make interest on one half of the purchase-money up to the 1st of September, though it seems strange that he had not proposed some arrangement for ascertaining the exact quantity of the land before that time, especially, as by the proofs in the cause land had risen in value, and this lot, on the 1st September, was worth $1,000 per acre.

50 *

The defendant applied for the complainant at his house, in Newport, on the 31st of August and on the day following, and in season to have completed the measuring of the land and the making of the deed, within the time limited in the contract. The complainant left Newport early on the morning of September 1st, leaving no agent to complete this contract, and no excuse or word for the defendant.

At law, the complainant is clearly without remedy. The parties having fixed a time for the performance of the contract, and the complainant by his own unexplained neglect having suffered that time to pass without being in readiness to perform his part of it, could recover no damages at law for breach of it by defendant.

Ought his neglect to avail him when he sues in equity for specific performance? We apprehend the rule is the same in equity as, in law in case of gross negligence by the plaintiff. When he asks exact justice between him and the defendant by a decree for specific performance, he is bound to allege, and prove, that he himself was at all times ready to do all the terms of the contract sought to be enforced, required of him. Unless he shows that he attempted to perform it in time, and was prevented by mistake or accident, he ought not to be permitted to require of the other party an exact performance of his contract. It is true, mere time is not regarded in law or equity as material, unless the parties make it so; but, in the meaning of these terms, they did make it material, when they agreed to a specified time for its execution. What other object could they have had in fixing upon any given time? To change it without cause, and to say it is immaterial and of no account, is, in fact, to substitute a term in the contract against the express agreement of the parties.

We do not understand this to be the rule in chancery, at least in modern times, nor the ground of its action. But whenever chancery finds a party ready and willing to perform his contract according to the letter of it, in point of time, as well as in all other respects, and that by reason of accident, or some unforeseen cause, he has not performed within the time, and that the breach of his part of the contract worked no injury

Ives *v.* Armstrong.

to the other which cannot be remedied or compensated for, it has enforced the contract. Such seems to us the rule of action to be deduced from the almost innumerable cases reported on this point. The rule was much more lax in early times, and more so always in England than in America. It is now nearly identical with the rule at law. There seems no good reason why there should be any difference; and we do not in fact find any, where the conduct of the party is marked with gross neglect, as in this case.

But it is said that the defendant by his acts and words on the 31st of August and 1st of September waived the performance of the contract on the last named day, and that he is estopped from setting up the neglect of the complainant as a bar to his recovery. It is a sufficient reply to this suggestion, that the complainant was not influenced in his conduct by anything then said or done by the defendant. That he could waive the performance on that day is, on all hands, admitted. It is charged in the bill that he did so, which charge is expressly denied in the answer, and the denial corroborated by other facts in the case.

BOSWORTH, J. I concur in the decision of the court in this case; but I have been led to my conclusion mainly from the insufficiency of the memorandum, relied on as evidence of the contract, to identify the premises claimed. There is no sufficient description of the premises contained in the writing, nor is there any reference to any other instrument containing such a description as will enable us to locate the land. Without dissenting from the grounds taken by the court in their opinion, I simply say, that this defect in the complainant's case had more weight on my mind in leading me to the conclusion to which the court have arrived. *Bill dismissed with costs.*